[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE MERITS
The plaintiff in the above-captioned case, Robert Civitello, seeks money damages for injuries and losses he claims to have sustained as a result of pricks to the inside of his mouth from a broken-off piece of a hypodermic needle in a breakfast sandwich he purchased and ate at a Burger King restaurant in Waterbury. The plaintiff seeks compensation for the initial injury, medical expenses, and mental distress at the prospect that he might have been infected with HIV. He claims that this fear persisted for six months until a second blood test indicated that he had not contracted HIV.
The plaintiff's complaint contains two counts. The first invokes the CT Page 1427 Connecticut product liability statute, Conn. Gen. Stat. §§ 52-572 et seq. The second count alleges a violation of the Connecticut Unfair Trade Practices Act, 42a-110 et seq. The court finds that the plaintiff has established liability as to the first count but not as to the second count.
The plaintiff credibly testified that on October 21, 1997, he and his estranged wife and their young daughter had met for breakfast and that he felt two sharp pricks of pain in his mouth as he ate his sandwich. His then-wife, Alexandra Civitello, testified in a deposition that was admitted into evidence that she observed him cringing after biting into his sandwich, and that he then removed something from his mouth into a napkin. He dabbed at his mouth, producing spots of blood on a napkin. The plaintiff approached two workers at the counter and explained that he had been injured by a metal object in his food. They conversed with each other in Spanish and one handed the plaintiff another breakfast sandwich. The plaintiff was annoyed at this response, which he felt to be insufficient; and he gathered up the food and left with Ms. Civitello and the child. The counter clerks did not ask him to fill in an incident report and in his annoyance he did not think to ask to make a report. At Ms. Civitello's house, he chopped up all the other sandwiches to see if there were any other fragments. On the advice of his grandmother, he went to St. Mary's Hospital for a tetanus shot.
Upon examining the item that the plaintiff had found in his sandwich, the medical personnel concluded that it was part of a hypodermic needle and prescribed inoculations against hepatitis, diphtheria and tetanus. The treating physician also ordered a blood test for the presence of HIV. The plaintiff understood that this test was negative but not conclusive. Though the plaintiff asserts that he was told to report for a follow-up HIV test in six months, the medical records do not confirm this schedule. The physician's assistant's note states that he was given the first dose of a hepatitis antibody and that "It is explained that he will need to follow up for results of lab tests and possible HIV testing to be repeated. He is given an appointment in the Family Health Center for Thursday, October 30, 1997 at 1 p.m., and he may call here or return sooner if he has any further problems." (Ex. C.)
The Record of Patient Instructions prepared in connection with the plaintiff's October 21, 1997 visit to St. Mary's Hospital included the instruction to call that hospital's Family Health Center for an appointment. This statement is followed by the notation "blood tests should be repeated in 6 wks." The reference to a test in six months appears to be related to the three-dose Recombivax injections, which St. Mary's staff scheduled for "2nd dose 11-21 3rd dose 6 mths fr[om] today." (Ex. C.) The plaintiff did not arrange for a follow-up HIV blood CT Page 1428 test in six weeks.
The plaintiff did not complete the course of Recombivax. On November 6, 1998, at the request of his then-attorney, the plaintiff visited a psychiatrist, Jeremy August, for a psychiatric evaluation. Dr. August's report includes a description of the Burger King incident and makes no mention of any fear on the part of the plaintiff that he might have been infected with HIV or that he was awaiting further HIV testing. Dr. August's examinations and the results of psychological testing led to the plaintiff's successful application for Social Security benefits based on the diagnosis of paranoid personality traits and "Adjustment Reaction with a depressed and anxious mood." Dr. August interviewed the plaintiff's girlfriend and several of his friends concerning the Burger King incident. This indication of thoroughness leads the court to conclude that if the plaintiff had been experiencing and expressing fear of HIV as an element of the aftermath of the incident, this fear would have been mentioned in Dr. August's report. It is not. In December 1998, Dr. August diagnosed the plaintiff as suffering from depression and treated him with Zoloft, an anti-depressant, and saw him approximately monthly for psychotherapy between January 1998 and November 18, 1999. Dr. August's notes concerning this therapy were not introduced into evidence.
The plaintiff, who had never had a steady job of any kind but who occasionally earned money by performing as a musician, had had an HIV test approximately a year before the Burger King incident in connection with a test for a sexually-transmitted disease. He had tested negative on that occasion.
On April 16, 1998, the plaintiff was tested for both HIV and sexually-transmitted disease (VDRL) not at St. Mary's Hospital but at Waterbury Hospital. The medical report mentions that "Mr. Civitello was seen with Dr. Romanik whose note describes this encounter," however, the only note of the visit is silent about any incident in October 1997 but mentions the HIV test that the plaintiff had had a year earlier. The note also documents "penile lesions." It appears likely that the HIV test in April 1998 was prompted not directly by the incident at issue but by a continuing concern about sexually transmitted diseases.
Records from Waterbury Hospital document that the plaintiff had a complete physical at Waterbury Hospital on March 3, 1998. Though the record of that visit includes details suggesting a discussion of general health issues, for example, the need for cholesterol screening and dangers of marijuana use, that record contains no indication of anxiety about possible HIV infection. CT Page 1429
Though the plaintiff claims that he was fearful for six months that he might have become HIV positive as a result of the prick from the needle fragment in his Burger King breakfast sandwich, the court finds that the extent of his damages from this defective product were less extensive than the plaintiff claimed at trial. He described no instance of preoccupation, inability to perform his normal activities, or even discussions with those close to him. He did not testify that he experienced sleepless nights or weight loss caused by worry. His medical records show a weight gain between October 1997 and April 1998. Though he began psychotherapy, fear of having contracted HIV is not mentioned in the very articulate and descriptive records of Dr. August. This fact and the absence of any reference to such anxiety at a physical exam that delved into other risk factors, including illegal use of marijuana, lead this court to believe that any concern that the incident could pose a real risk to the plaintiff's health was at most intermittent.
His estranged wife, with whom he talked often, stated in her deposition testimony that the plaintiff said that he was fearful that the needle prick might have caused him to become HIV-positive, but that before six months had passed she was no longer in contact with him frequently. She did not know the result of the April 1998 HIV test. Her view of the plaintiff was that after this incident his existing prejudice against Hispanic people had deepened and he frequently made disparaging or angry remarks about them, and that he related his attitude to what he regarded as bad treatment by the counter personnel at Burger King. This witness had only a vague recollection of the events, and the court does not accord much weight to her hazy and very vague testimony concerning the plaintiff. Dr. August described a preoccupation with Hispanic people "taking over the country" as one of the indications of paranoid personality disorder in his initial report.
Having considered all the evidence, the court finds that the defendant put a defective product into the stream of commerce and that the plaintiff was injured by reason of that defect. The court finds that the incident touched off anger, depression and paranoid feelings that caused the plaintiff to need the help of a psychologist. The plaintiff does not claim that the psychological problems that led to his receiving federal benefits were caused by the defendant's defective product. Only four of the plaintiff's sessions with Dr. August pre-dated the test that indicated the plaintiff was HIV-negative in April 1998, and he has not sought HIV testing since that date. The court has considered the plaintiff's counsel's argument that the plaintiff's psychological condition caused his anxiety to be greater than that of other people. In arriving at damages, the court has applied the principle that the defendant takes the victim as it finds him. CT Page 1430
The court finds that fair, just and reasonable compensation for the plaintiff's economic and non-economic injuries is as follows:
Economic damages $433.22
Noneconomic damages $12,000.00
The parties stipulated that the plaintiffs' bills from Waterbury Hospital and St. Mary's Hospital have been paid by collateral sources. Only Dr. August's are unpaid. The court finds that only the charges for the first four visits to Dr. August are causally related to the defective product. The economic damages also include the cost of the food purchased.
The non-economic injuries include the physical pain of the injury itself, the inconvenience of having to seek medical testing and treatment, the pain of injections to a person who described himself as very anxious about injections, and fear of the possibility that even though an initial HIV test had been negative, a future test might not be. The court finds that this fear was neither as lengthy nor as intense as the plaintiff wished the court to believe.
Conclusion
As to Count One, judgment shall enter in favor of the plaintiff in the amount of $12,433.22. As to Count Two, judgment shall enter in favor of the defendant.
The plaintiff shall recover his statutory court costs upon filing a bill of costs with the clerk of the court.
Beverly J. Hodgson Judge of the Superior Court CT Page 1431